UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

KRISTEN A. HENRIKSON )
    Plaintiff, )
     )
     )
    v. )        C.A. No. 11-381-M
     )
TOWN OF EAST GREENWICH, by and )
through its Finance Director, KATHLEEN )
RAPOSA; EAST GREENWICH FIRE )
FIGHTERS ASSOCIATION, LOCAL 3328, )
INTERNATIONAL ASSOCIATION OF )
FIRE FIGHTERS, AFL-CIO, CLC )
    Defendants. )
     )

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., UNITED STATES DISTRICT COURT JUDGE

    This lawsuit arises out of the employment of Kristen A. Henrikson by the Town of East

Greenwich, Rhode Island ("Town"), and, specifically, out of the Town's failure to permit her, as

a then-existing Union member filling the position of Chief Tax Clerk, to transfer into a vacant

firefighter[1] position without fulfilling five test-based qualifications spelled out in the Application

Package ("posting") for the vacancy. (ECF No. 58-7 at 2). Ms. Henrikson contends that she was

not obligated to fulfill those qualifications because she was applying as a "transfer" and not as a

new hire, and that the only criteria she was required to meet were seven general items specified

in the Collective Bargaining Agreement itself that were not specific to a firefighter position. She

maintains that the Town's failure to transfer her was not only a breach of contract but an act of

---

[1] The parties in their filings and in extrinsic documents refer to the position as "Fire Fighter,"
while the Collective Bargaining Agreement refers to "firefighter." The Court adopts the latter
nomenclature.

sex discrimination, both intentional and in its impact. She further contends that her Union failed to represent her in good faith and, moreover, conspired with the Town to deprive her of her civil rights.

Jurisdiction for the nine-count Complaint[2] is provided by 28 U.S.C. §§2201, 2202 and 1331, with respect to the claims that arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 *et seq.*, and 42. U.S.C. §§1983 and 1985. Supplemental jurisdiction is appropriate for the state law claims of Breach of Contract and Breach of the Duty to Represent, as well as that claiming a violation of the Rhode Island Civil Rights Act, R.I.G.L. §42-112 *et seq. See, Godin v Schencks*, 629 F.3d 79, 83 (1st Cir. 2010) (supplemental jurisdiction appropriate when state claims are so related they form part of the same case or controversy).

The Town and Union have filed for summary judgment on all counts, contending that none of Ms. Henrikson's claims should proceed to trial. (ECF Nos. 56, 57). The individual counts will be discussed below, but it suffices to say at this juncture that as to some claims the Defendants maintain there is no disputed evidence of material fact and they are entitled to judgment as a matter of law; as to others, the Defendants maintain the statute of limitations has expired; as to yet others, the Defendants maintain Ms. Henrikson has failed to exhaust state or administrative remedies.[3] Ms. Henrikson has cross-filed for summary judgment with respect to Count VII (ECF 63), which alleges the Town breached its contract with her.

In summary, for the reasons that follow, the Court finds that (a) the Town and Union did not breach the collective bargaining agreement because the agreement allowed the Town to

---

[2] Among Ms. Henrikson's claims is Count IX, entitled "Bad Faith," this claim fails for jurisdiction in that it lacks a cause of action. This contention is discussed in more detail, *infra* at Part III(C).

[3] A previous Motion for Summary Judgment filed by the Union (ECF No. 45), alleging a failure to exhaust intra-union remedies, was denied on 5/28/2014 by Text Order.

impose additional qualifications for becoming a firefighter and Ms. Henrikson did not meet them; (2) the Union did not breach its fiduciary duty to Ms. Henrikson because it correctly interpreted the agreement and therefore had no duty to further pursue Ms. Henrikson's grievance; and (3) there is insufficient evidence of gender-based discrimination in the record to support any of the civil rights claims. Therefore the Court grants the Motions of the Town and Union for Summary Judgment as to all Counts, and denies Ms. Henrikson's cross-Motion for Summary Judgment.

## I.

## **Factual Background**

Few facts are disputed here, and none upon which liability rests. The undisputed facts reveal that Kristen Henrikson has been employed by the Town of East Greenwich for approximately 12 years, serving at the time she filed the lawsuit as Chief Tax Clerk of the East Greenwich Fire District.[4] Sometime in December 2008, she expressed to then-Fire Chief John McKenna her desire to transfer to the position of Fire Marshall. At all relevant times, Ms. Henrikson has been a member of the East Greenwich Fire Fighters Association, Local 3328, International Association of Fire Fighters, AFL-CIO, CLC (hereafter "Union"), and a Collective Bargaining Agreement (hereafter "CBA")[5] has governed certain aspects of employment, including the filling of vacancies. Ms. Henrikson was offered the position of Fire Marshal and

---

[4] On June 3, 2013, the Town was authorized by special legislation to acquire what had been the East Greenwich Fire District. (ECF Nos. 34, 35) (Motion to Substitute Party). The Town of East Greenwich, through its Finance Director, was then substituted in this litigation for the District as well as for the individuals originally sued in their capacities as District Board members (9/25/2013 Text Order).

[5] ECF No. 58-2.

accepted it.[6] Shortly thereafter, however, she changed her mind and decided to stay as Chief Tax Clerk until she had completed the qualifications for the position of firefighter; at that point, she was working on but had not yet completed a certification as EMT-C[ardiac] that all parties agree was a qualification for a firefighter.

On May 26, 2009, Ms. Henrikson requested to be transferred to what was then a vacant firefighter position. Although she was still in the process of obtaining the EMT-C certification, she requested that the position be held open until she had finished that course. The Town did not do so. During the course of the next few months, a series of conversations and meetings occurring among Ms. Henrikson, the Fire Chief, Union officials, and the Union Executive Board, revealed their disagreement as to the qualifications required for an existing employee to transfer into a firefighter vacancy. As explicated in more detail below, Ms. Henrikson maintains that she is excused from meeting five test-based qualifications contained in the posting for firefighter (ECF No. 58-7) because she is an existing employee; her assertion is that only new hires must meet those test-based qualifications.

A meeting occurred on May 26, 2009, involving Ms. Henrikson, Chief McKenna, and William Purcell, the President of the Union. (ECF No. 48-4 at 24). According to Mr. Purcell's deposition, Chief McKenna was advocating that Ms. Henrikson bid for a firefighter vacancy and espousing the position that she met the qualifications for transfer. *Id.* Mr. Purcell, speaking for the Union, questioned whether she did and consulted with the Rhode Island State Association of Firefighters. (*Id.* at 29-30). The Defendants dispute the characterization of Chief McKenna's position, but this is not a material fact that influences the outcome of the summary judgment motions. Even had he initially thought differently, by letter dated July 10, 2009, Chief McKenna

---

[6] ECF No. 63-5 at 86.

denied Ms. Henrikson's request to fill the vacant firefighter position (ECF No. 58-8) on the ground that she had not completed the required tests. (ECF No. 58-9).

Ms. Henrikson filed a grievance requesting that she be given the next available firefighter vacancy. (ECF No. 58-11). She met with the Executive Board of the Union and the Union denied the grievance three days later. (ECF No. 46-6). There is an appeal process outlined in the CBA if the Union is dissatisfied (ECF No. 58-2 at 33), but no appeal was taken and the Union failed to pursue the grievance. (ECF No. 63-4).

The operative event giving rise to the lawsuit concerns a second request by Ms. Henrikson on November 4, 2009, to be hired to fill another firefighter position that had become vacant. Ms. Henrikson appeared before the Board of Commissioners of the then-East Greenwich Fire District, but at its next meeting the Board rejected her transfer on the stated ground that she was not qualified; at this meeting, the Town formally took the same position as the Union that Ms. Henrikson had failed to successfully complete the five tests contained in the posting. (ECF No. 58-13 at 8-9; ECF No. 48-8 at 6-7).

Ms. Henrikson subsequently filed a complaint with the Rhode Island Commission for Human Rights. (ECF No. 58-16). The Commission found "no probable cause" and dismissed the action, but it issued Notices of Right to Sue. (ECF No. 3-2). This lawsuit followed.[7]

---

[7] On April 30, 2012, some eight months after filing her initial complaint in this Court, Ms. Henrikson filed an action in the Rhode Island Superior Court alleging breach of the duty of fair representation and bad faith. That complaint was dismissed on the Defendants' motion on or about October 18, 2012. *Henrikson v. East Greenwich Fire District,* C.A. KC 12-0483 (ECF No. 58-19). Thereafter, Ms. Henrikson amended her federal court complaint to include those state-law based counts. (ECF Nos. 1, 20, 28).

## The Core Disputed Legal Issue

The core dispute between the parties requires an interpretation of language in the CBA referencing the filling of vacancies either by transferring existing employees or by hiring new ones. Ms. Henrikson contends that the only qualifications she, as a transferring employee, must meet are seven non-job-specific criteria specified in ¶11-2 of the bargaining agreement. The seven relate to citizenship, a physical examination, "legal age of employment," having and maintaining an EMT-C license and a RI driver's license, and motor vehicle and criminal history. The Town and the Union, however, contend that both transferring employees, including Ms. Henrikson, and new employees, must meet five *additional* firefighter-specific, test-based qualifications that are contained in the Application Package ("posting") for the firefighter vacancy. (ECF No. 58-7 at 2) (physical performance assessment test, a written exam, a swim test, a ladder test, and an oral interview). There is no dispute that Ms. Henrikson meets the seven items specified in the CBA, but does not meet the five test-based qualifications contained in the posting.[8]

Because the Fire District did not consider Ms. Henrikson qualified for the firefighter position, it refused to include her on the "eligibility list" for that position. It is from the "eligibility list" that the Town chooses applicants. CBA §11-1 (ECF No. 58-2 at 14).

Count VII, which alleges a breach of contract, directly turns on the resolution of the above dispute. If the contract allows the five test-based, job-specific qualifications, it has not been breached by the insistence of the Town that Ms. Henrikson meet them in order to qualify

---

[8] ECF No. 56-1 at ¶28 (Ms. Henrikson's admission that as of July 10, 2009 she had not completed the agility test, written exam, or the ladder test); (ECF No. 56-1 at ¶¶34, 35) (Ms. Henrikson's admission that she did not pass the agility test "according to the way in which the test was administered").

for employment as a firefighter. If, on the other hand, the CBA does not require transferred employees to successfully complete those five tests, the contract has been breached.

All other counts of the Complaint are intertwined analytically with the breach of contract claim. For example, if the Union's position on qualifications is borne out by the contract, that is relevant to whether the Union, by not pursuing Ms. Henrikson's grievance, has failed to discharge its duty to fairly represent her. If the Town's position on qualifications is an accurate mandate of the contract, that is relevant to whether the reason for not placing Ms. Henrikson on the eligibility list of persons qualified to fill the firefighter vacancy was due to sex discrimination or instead something not emblematic of unlawful treatment.

Therefore the Court will address the breach of contract claim first, as its decision on that issue will inform much of the remaining discussion.

### III.

### Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs the summary judgment process. It provides,

**Rule 56. Summary Judgment**

(a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT.
A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

By the terms of Rule 56, a party is entitled to summary judgment only if both conditions specified in Rule 56 are met: that "no genuine dispute [exists] as to any material fact" and that the undisputed facts demonstrate that the party is "entitled to judgment as a matter of law." *See,*

*Knight v. Mills*, 836 F.2d 659, 664 (1st Cir. 1987) (undisputed material facts, together with inferences drawn against the movant, "must lead to one reasonable conclusion in favor of the movant" to justify summary judgment). A material fact is one that "might affect the outcome of the suit under the governing law. ... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment deprives the parties of the opportunity to have a jury determine the outcome. But it serves the important purpose of weeding out those cases that do not warrant a trial because there are no facts in dispute to be decided by a jury: "[The summary judgment] rule acts as a firewall to contain the blaze of cases that are so lacking in either factual foundation or legal merit that trial would be a useless exercise." *Conward v. Cambridge School Committee*, 171 F.3d 12, 18 (1st Cir. 1999), quoted in *Napier v. Town of Windham*, 187 F.3d 177, 184 (1st Cir. 1999). "[T]he 'salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases' than to other types of cases." *Feinson v. New Sch. For Soc. Research*, 1997 WL 742532 at 8 (S.D.N.Y. 1997). Thus, the law requires that all reasonable inferences be drawn against the moving party and that summary judgment be granted if the undisputed facts and inferences that flow from them allow of only one reasonable conclusion in favor of the movant. *Knight, supra*, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, [251] (1986).

## A. Count VII: Breach of Contract

Ms. Henrikson's breach of contract claim is governed by Rhode Island state law. The Court must first decide whether the language of the contract is ambiguous on its face, and that is an issue of law. *Inland Am. Retail Mgmt. LLC v. Cinemaworld of Fla., Inc.*, 68 A.3d 457, 461-62 (R.I. 2013). The initial determination of ambiguity is made on the face of the document,

giving the words their plain and ordinary meaning, without recourse to discerning the intent of the parties or reference to extrinsic evidence. *Id.* at 462. If the court finds that the language is ambiguous, it then looks to extrinsic evidence, including the construction put on the terms by the parties, to determine that intent. *Elena Carcieri Trust-1988 v. Enter.Rent-A-Car Co.,* 871 A.2d 944, 947 (R.I. 2005).

The Town and Union assert that the contract permits extrinsically-referenced qualifications for firefighter (and that those five test-based qualifications are contained in the posting for the position), while Ms. Henrikson asserts that the CBA itself contains the exclusive - and limited - qualifications for firefighter with regard to a person transferring from another position in the Fire Department. There are six provisions of the CBA[9] upon which the parties rely in promoting their respective interpretations of the bargaining agreement.

SECTION 3 - DEFINITIONS

ELIGIBILITY LIST: A list of names of persons who have been found qualified through suitable tests or through reinstatement for employment.

SECTION 4 – MANAGEMENT RIGHTS

4-1    The District retains all the powers and rights to:

* * * * * * * * * * * * * * *

g.    Hire, schedule, promote, demote, transfer and assign employees in accordance with the applicable sections of this agreement.

h.    Recruit, select, and determine the qualifications and characteristics of employees in accordance with the applicable sections of this agreement.

SECTION 10 – APPOINTMENTS

10-1    Appointments to newly established positions or appointments to vacant positions, with the exception of the positions of Chief and Deputy Chief, shall be

---

[9] ECF No. 58-2.

offered to present employees of the District, providing they are qualified for the position being filled.

10-2    Should more than one employee be equally qualified, the most senior employee shall be offered the position first.  However, if no employee accepts appointment to the position being offered, appointments shall be made from an appropriate eligibility list in accordance with section 11 of this agreement entitled "new employees."

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SECTION 11 – NEW EMPLOYEES

11-1    The District shall maintain an eligibility list for the existing position of professional firefighter within the District, consisting of a pool of eligible candidates who have been determined to be qualified for future employment by the District.  The foregoing shall not be construed so that the District will use the pool of eligible candidates for filling temporary vacancies where permanent employees of the District are available for the filling of such vacancies.

11-2    All employees hired for the position of professional firefighter shall meet and maintain the following minimum qualifications:

    a.  Be a citizen of the United States of America or have applied for citizenship.
    b.  Pass a physical examination, by a physician chosen by and paid for by said District.
    c.  Be within the legal age of employment.
    d.  Be a licensed R.I. EMT-C or higher.
    e.  Maintain R.I. EMT-C certification during employment.
    f.  Successfully complete an evaluation of a criminal and motor vehicle history.
    g.  Have a Rhode Island Drivers License.
    h.  Hiring shall be at the sole prerogative of the Board of Fire Commissioners.

The posting[10] includes two categories of qualifications:  (a) minimum age of 18, diploma or GED, competence in English, and U.S. citizenship; and (b) completion of the Physical Performance Assessment Test (PPA) and an oral interview, and sufficient scores on a written exam, a swim test, and a ladder climb test.

_____

[10] ECF No. 58-7.

Restating the positions of the parties with reference to the CBA itself, they are:

Town and Union: Management has the prerogative to establish qualifications, there is nothing that limits the qualifications to those contained in the CBA, and the Town has in fact established additional qualifications in the posting that Ms. Henrikson has not met.

Ms. Henrikson: Section 10 of the CBA gives her preference over new hires, new hires are subject to the eligibility requirements of the posting, but she as a transferee is subject only to the qualifications set forth in §11-2 of the CBA, and she meets those qualifications.

The Court starts its inquiry with §4-1(h) of the CBA, which in plain terms establishes that management may set qualifications for all positions ("The District retains all the powers and rights to … determine the qualifications and characteristics of employees"). This is consistent with §11-2(h), which provides that "[h]iring shall be at the sole prerogative of the Board of Fire Commissioners."

The plain language of §§4-1(h) and 11-2(h) leaves but one conclusion: that the Town, through the Board, was entitled to establish whatever legal qualifications it deemed appropriate for the position of firefighter. The inquiry, however, does not end here because Ms. Henrikson maintains that §11-2(a) through (g), in combination with §§10-1, 10-2, and 11-1, limit the qualifications that the Town may use in the case of a transferred employee to those enumerated in §11-2(a) through (g). She reaches this conclusion through reasoning that the Court finds unpersuasive.

First, Ms. Henrikson points to §10-1's mandate that appointments to vacancies "shall be offered first to present employees of the District, providing they are qualified for the position being filled." As to the first clause, no one disputes that present employees have "first dibs" on vacancies, but that promise does not inform one way or the other what the qualifications or

prerequisites are. It is the *second* clause of §10-1 that the Court finds more significant. It requires that a transferred employee be "qualified for the position being filled," making clear that an employee desiring to transfer must meet *some* criteria related to the vacant position: the Town and Union contend those qualifications are the ones contained in the firefighter posting. Ms. Henrikson does not accept those qualifications, because she does not meet them, but she must point to *some* qualifications: if she could not, the "providing" language of §11-1 would be mere surplusage without meaning, a result that principles of contract interpretation forbid. *Andrukiewicz v. Andrukiewicz,* 860 A.2d 235, 239 (R.I. 2004) ("When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; and interpretation that reduces certain words to the status of surplusage should be rejected.").

Constrained to find *some* qualifications for existing employees to which the "providing" clause of §10-1 refers, Ms. Henrikson relies on §11, which is entitled "New Employees" and specifically §11-2(a) through (g) setting forth the seven items listed *infra* (minimum employment age, driver's license, citizenship, EMT-C license). In a similar vein, Ms. Henrikson must invest the five-test requirements contained in the posting with *some* meaning, so she relegates those to "new hires." Her interpretation in combination, then, is: transferees must meet only the seven items of the CBA §11-2, but new hires must meet those plus the five-test qualifications of the posting.

If existing employees were qualified solely because they meet the §11-2(a) through (g) list, but new employees had to meet all the criteria of the posting, a 16-year-old existing employee with a driver's license would be qualified to become a firefighter, but a new hire would have to be 18 years old as specified in the posting. (ECF No. 58-7). An existing transfer

would need to demonstrate no education milestone, but a new hire would have to have a high school diploma or GED as required by the posting. An existing transfer would not have to demonstrate any physical capabilities, but a new hire would have to demonstrate a certain level of ability to rescue people. This construction belies common sense.

Ms. Henrikson's position that she is subject only to the requirements of §11-2 suffers from two other flaws. First, she acknowledges that the CBA itself allows for qualifications set forth in *extrinsic* documents because she herself accepts the Fire Marshal criteria that are set forth in that posting.[11] She maintains, however, that the reference to firefighter vacancies in §11-2 means that §11-2(a) through (g) were intended to be *exclusive* qualifications. But the language clearly characterizes §11-2 (a) through (g) as "minimum qualifications." The Town maintains that the word "minimum" signals that there are other qualifications contained in an extrinsic document; Ms. Henrikson maintains that the word "minimum" means that applicants are invited to come with other, additional skills and achievements but are not required to do so. Either way, the word "minimum" neither means nor signals "exclusive" and in the absence of exclusivity there is nothing in the CBA that limits the Town's invocation of further qualifications contained in an extrinsic document.

Second, Ms. Henrikson argues that while she is subject to the qualifications list of §11-2, she is *not* subject to the terms of §11-1 that mandates that the District keep an "eligibility list" of

---

[11] ECF No. 63-5(O). *See Plaintiff's Memorandum* (ECF No. 50-1 at 2). The conclusion that qualifications for various positions can be set forth in extrinsic documents is also bolstered by the fact that otherwise there would be *no* qualifications for existing employees to become dispatchers or clerks beyond being a citizen, having a driver's license and the like, when basic qualifications not contained in §11-2 must as a matter of common sense be required, such as, for example, having understandable speech, being able to alphabetize, or having familiarity with a computer or a telephone system.

people "who have been determined to be qualified for future employment." *That* subsection, she contends, applies only to new employees, not to transferees.[12]

For all the reasons stated above, the Court finds unpersuasive Ms. Henrikson's reading of the contractual language, and finds that the CBA unambiguously allows extrinsic qualifications to be imposed upon current employees wishing to transfer into the position of firefighter. That being so, it is undisputed that Ms. Henrikson did not meet the qualifications set forth by the Town. The Town is therefore entitled to judgment as a matter of law that it did not breach its contract by refusing to appoint her to the position.[13] As to Count VII, the Town's Motion for Summary Judgment (ECF No. 56) is hereby granted, and Ms. Henrikson's cross-Motion for Summary Judgment (ECF No. 63) is denied.

Conclusions with respect to certain other Counts follow almost inexorably from the contract interpretation. The Court addresses those other Counts in order of degree to which the Court's interpretation of the CBA causes them to fail.

## B. Count VIII: Breach of Duty of Fair Representation

"[A]n exclusive bargaining agent [has a statutory duty] to fairly and adequately represent the interests of all of those for whom it negotiates and contracts, not only those who are

---

[12] If Ms. Henrikson allows of the possibility that §11-1 applies to her as a transferee, she runs into the problem that "eligibility list" is defined in the CBA as "persons who have been found qualified through *suitable tests* or through reinstatement for employment" (emphasis supplied). Since §11-2 itself contains no "tests," the clause presumably refers to tests contained in extrinsic qualification documents.

[13] There is a related but independent basis upon which summary judgment for the Town is required. In *DiGiulio v. Rhode Island Bhd. Of Corr. Officers*, 819 A.2d 1271, 1272-73 (R.I. 2003), the Rhode Island Supreme Court held that an employee suing a municipal employer for breach of contract when his or her union has failed to pursue the grievance must "[demonstrate also] that the union breached its duty to represent the employee fairly." Without that showing, the employee "does not have any standing to contest the merits of his contract claim against the employer in court." *Id.* at 1273. This Court has found that the Union did not breach its duty of fair representation and thus, as a matter of state law, the claim of breach of contract must fail. *See infra* at Part III(B).

14

members, but all those who are part of the bargaining unit." *Belanger v. Matteson*, 346 A.2d 124, 129 (R.I. 1975), adopting the reasoning of *Steele v. Louisville & Nashville R.R.,* 323 U.S. 192 (1944) (reviewing representation of public school teachers). The duty is owed not only to the entire body of employees when conducting negotiations, but to individual members presenting grievances. *Id.* at 130-31. It is with that latter responsibility that this case is concerned, as Ms. Henrikson alleges that the Union's failure to carry the torch for her in her battle with the Town's hiring protocol violated the duty it owed to her as an individual employee.

To fulfill its duty, the Union must investigate, must afford the aggrieved employee an opportunity to present her case, and must make a decision in a non-arbitrary way.[14] "The duty upon the Union here is to * * * in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances, *Vaca v. Sipes*, 386 U.S. 171, 194, 87 S.Ct. 903, 919, 17 L.Ed.2d 842, 860 (1967), and, if it decides to pursue a grievance, it must not do so in a perfunctory manner." *Belanger* at 131.

In this case, the Union failed to press Ms. Henrikson's grievance, failed to advocate for her in her dispute over contract interpretation, and did not represent her at the November 2009 meeting with the Fire District. The undisputed facts, however, demonstrate that at all stops along the route from Ms. Henrikson's first formal expression of her desire for the particular open firefighter position to the final decision of the Town, the Union manifested its belief that the CBA imposed qualifications for the job that she agrees she did not have. It maintained this position throughout. With respect to the Union's obligation to investigate, there was nothing to learn that it did not know: Ms. Henrikson points to no lack of information contributing to what

---

[14] "[A] union must be free to sift out wholly frivolous grievances which would only clog the grievance process, ...." *Belanger v. Matteson, supra* at 130, quoting *Humphrey v. Moore*, 375 U.S. 335, 349-50 (1964).

she alleges is simply the wrong interpretation of the CBA by the Union. Notwithstanding that it interpreted the policy against her, the Union afforded her an opportunity to meet with its Executive Board. *See Hart v. W. Warwick Firefighters' Union Local #1104,* 2013 WL 3985036 at 7 (R.I.Super. 2013) (opportunity to argue position at Executive Board sufficient).[15]

This is a case in which the Union position was one of global interpretation of the contract, having little to do with the facts of Ms. Henrikson's situation. The dispute involved two conflicting interpretations of contractual language, and the Union position was not such as to be influenced by the vagaries of any individual member's situation. Thus, the opportunity to be heard that *was* afforded Ms. Henrikson was appropriate to the nature of the dispute. *See Emmanuel v. Int'l Bhd of Teamsters, Local Union No. 25,* 426 F.3d 416, 420 (1st Cir. 2005) (investigation may be "minimal" and "only an 'egregious disregard for union members' rights constitutes a breach of the union's duty' to investigate"), partially quoting *Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1483 (9th Cir. 1985). The fact that her attempts to persuade the Union were unavailing does not make its position arbitrary or arrived at through bad faith.[16]

For the reasons articulated above, the Court grants summary judgment on Count VIII to the Defendants.

---

[15] The Union also contends that Ms. Henrikson failed to pursue its internal appeal process that permits an employee dissatisfied with the Union's handling of its grievance to appeal to the Local's president. *See* Bylaws, Article XVIII (ECF No. 46-7). Because of the Court's ruling on the merits of Ms. Henrikson's claims, the impact of this failure, if any, need not be addressed. In addition, the Court has already denied an earlier motion for summary judgment on this ground. *See* n. 3, *infra.*

[16] Indeed, Ms. Henrikson testified that she thought the Union sincerely believed its position was correct. (ECF No. 46-2 at 224).

### C. **Count IX: Bad Faith**

Count IX contends that the Union's decision to deny the grievance, without affording a full hearing or "contemplation of all facts" was "bad faith conduct." The Court is in agreement with the Union that there is no cause of action invoked here. There is no "tort" of "bad faith conduct," nor any other source of liability, common law or statutory, of which the Court is cognizant, nor does Ms. Henrikson's Complaint cite to any. Moreover, to the extent that this formulation of wrongdoing merely cloaks the "breach of duty of representation" in a different garment, the Court has already found the absence of bad faith in the position the Union took and has already noted that the positions of the parties here were not grounded in facts to be discovered but in contract language to be interpreted; thus a full hearing to "present [her] case" would have been highly unlikely to have resulted in a change of Union perspective.

The Court grants summary judgment to the Defendants on Count IX.

### D. **Count V: Civil Conspiracy and Count VI:**
### **Conspiracy to Interfere with Civil Rights, 42 U.S.C. §1985(3)**

Counts V and VI allege conspiracies between the Town and the Union "with the purpose of accomplishing the unlawful objective of intentionally and deliberately limiting employment opportunities to males, and denying Plaintiff employment as a fire fighter and consideration for employment as a fire fighter on the basis of her sex."

Both counts require as elements (a) an agreement and (b) a specific purpose. "In order to establish a civil conspiracy, there must be evidence from which a party 'may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise.'" *Fleet Nat'l Bank v. Anchor Media Television,* 831 F.Supp. 16, 45 (D.R.I. 1993), *aff'd,* 45 F.3d

546 (1st Cir. 1995).[17]  A claim of conspiracy to violate civil rights is similar, but has four

discrete elements: (a) a conspiracy; (b) a purpose to deprive the plaintiff of equal protection of

the laws; (c) an overt act in furtherance of the conspiracy; and (d) an injury or deprivation of

civil right. *Lebaron v. Spencer,* 527 Fed. Appx. 25, 33 (1st Cir. 2013).  Each thus require, *inter*

*alia*, a meeting of the minds (agreement) on a specific purpose, in this case to limit employment

opportunities to males.

What the undisputed facts demonstrate here is a confluence of opinion on the part of the

Union and the Town:  both interpreted the CBA to mean the same thing.  There is no evidence

that the entities reached their identical opinions as a result of "agreement" rather than

independent thought.  The mere "sameness" of the opinion does not give rise to an inference that

there was an 'agreement" on the part of the Town and Union to interpret the language with the

intent to do harm to Ms. Henrikson.  "A civil rights conspiracy as commonly defined is a

combination of two or more persons acting in concert to commit an unlawful act ... the principal

element of which is an agreement between the parties to inflict a wrong against or injury upon

another." *Lebaron v. Spencer, supra* at 33, quoting *Estate of Bennett v. Wainwright*, 548 F.3d

155, 178 (1st Cir. 2008).  There is no evidence of any discussions or even communications on

this topic between the Town and Union *prior* to the expression by Union President Purcell of the

Union's position in May 2009.  And, moreover, since this Court finds that the language of the

CBA is clear on its face and not ambiguous, the coincidence of interpretation is hardly likely to

have been accomplished nefariously.

---

[17] Beyond lacking any evidence of an agreement, as explicated below, the "civil conspiracy"
count suffers from another fatal problem.  "Civil conspiracy" is not a cause of action establishing
"an independent basis of liability, but merely a means of establishing joint liability for tortious
conduct.  Thus, a civil conspiracy claim requires a valid underlying intentional tort theory."
*Guilbeault v. R.J.Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 268 (D.R.I. 2000).

Finally, whether Ms. Henrikson's suspicion is true – that neither the Town nor the Union were, or even still are, desirous of allowing women to be firefighters – there is not sufficient admissible evidence presented to permit a jury to decide that either directly or by inference they discriminated against women generally or against her because she is a woman. *See infra* at Part III(F). Thus, there is no evidence that even if there were an "agreement" between the Town and the Union (which the Court finds that there is no evidence of), there is nothing but speculation to support an allegation that the purpose of that unproven agreement was to "limit[] employment opportunities to males."

The Court therefore grants summary judgment as to Counts V and VI to the Defendants.

### E. Count I: Discrimination (by Disparate Treatment); Count II: Discrimination (by Disparate Impact); and Count III: Deprivation of Civil Rights by Sex Discrimination.

These three claims sound in different statutory causes of action[18] but rely on the same general assertion: Ms. Henrikson contends that because she is a woman she was denied the ability to transfer into the position of firefighter – either because she was intentionally discriminated against on account of her gender, or because the Town's policy that subjects transferred employees to the five tests had a disparate and adverse impact on the hiring of women generally, or because the Town and Union set out to violate her civil right to equal employment because she is a woman.

---

[18] Ms. Henrikson seeks a remedy for intentional discriminatory treatment pursuant to Title VII, 42 U.S.C. §2000e-2(a)(1) ("unlawful employment practice … to discriminate … because of such individual's race, color, religion, sex, or national origin;" for adverse and disparate impact pursuant to Title VII, 42 U.S.C. §2003-2(a)(2) ("unlawful employment practice … to classify his employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin"); and for sex discrimination pursuant to 42 U.S.C. §1983 (imposing liability for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" under color of state law).

Although these counts share a common theme, they present different legal issues and therefore are addressed separately below.

It is beyond dispute that in the employment context, gender[19] – like race, color, religion, and national origin – is afforded special protection.[20]  Congress enacted Title VII, "one of the brightest stars in the firmament of this nation's antidiscrimination laws." *Serapion v. Martinez*, 119 F.3d 982, 985 (1st Cir. 1997).  In addition to precluding discriminatory treatment on the basis of gender, Title VII also prohibits the implementation of policies which, while facially neutral, are applied in such a way as to have an adverse and disproportionate impact on account of gender.  The Court will deal with each of these two separate theories *seriatim*.

(1). Disparate Treatment

A claim of disparate treatment is a claim of intentional discrimination, although the intent to discriminate is often proven by inference rather than direct evidence.  *Smith v. Stratus Computer*, 40 F.3d 11, 15 (1st Cir. 1994).  The allocation of the burden of proof in a disparate treatment case reflects the frequent inability of a plaintiff "to offer direct proof of her employer's discrimination."  *Id.*  Where there is no direct proof of discrimination, as there is not here, "the *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)] analysis [requires] a plaintiff [to] establish a prima facie case, which in turn gives rise to an inference of discrimination." *Ugurhan Alcturk Kosereis v. Rhode Island*, 331 F.3d 207, 212 (1st Cir. 2003) (allegations of

---

[19] "Gender" and "sex" are frequently used interchangeably in this context.

[20] Title VII is not the exclusive protection against category-based discrimination in employment. Individual other statutory schemes address other groups. *See, e.g.,* 29 U.S.C. §621, the Age Discrimination in Employment Act (ADEA) and 42 U.S.C. 12101, the Americans with Disabilities Act (ADA).  And Rhode Island state statutes go further to bar such discrimination based on a person's sexual orientation as well as "gender identity or expression."  R.I. Fair Employment Practices Act, R.I.G.L. §28-5-2.

discrimination based on religion and national origin). The burden of establishing a prima facie case is "a light one," *Smith v. Stratus Computer, supra,* but it requires that the plaintiff show

> 1) she was a member of a protected class, 2) she was qualified for her position, 3) she was subjected to an adverse employment action, and 4) the position remained open or was filled by someone with similar qualifications. Such a showing creates a rebuttable presumption that the employer engaged in discrimination.

*Pina v. Children's Place,* 740 F.3d 785, 796 (1st Cir. 2014).

Once the plaintiff demonstrates a prima facie case, the employer picks up the burden of the second step of what is a three-step analytic staircase: "The employer then must state a legitimate, nondiscriminatory reason for its decision." *Id.* If the employer successfully ascends that step, "the inference of discrimination disappears and the plaintiff is required to show that the employer's stated reason is a pretext for discrimination." *Id.*[21]

In this case, the CBA itself, as construed by the Town, the Union, and this Court, is the obstacle to Ms. Henrikson making out a prima facie case. She meets the first criterion because she is a member of a protected class based on her gender. The second criterion that she must demonstrate is that "[s]he was qualified for the job ..." *Ugurhan Alcturk Kosereis, supra* at 212-13.

The Court has already construed the CBA language as requiring an applicant for a firefighter job, even a person wishing to transfer from an existing Fire District position as Ms. Henrikson was, to complete five "tests" specified in the posting for the firefighter vacancy. Ms. Henrikson admits that she did not complete those tests. Thus, she cannot meet the second

---

[21] A "pretext for discrimination" combines two discrete notions: "(1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory." *Smith v. Stratus Computer, supra* at 16.

element of a prima facie case of workplace sex discrimination: "[that s]he was qualified for the job."[22]

Even if Ms. Henrikson had established a prima facie case, she has not demonstrated that a genuine issue exists at the third step of the *McDonnell* analysis that would permit a jury to rationally conclude that the Town's reliance on the CBA was merely pretextual. To carry this burden of persuasion before a jury, Ms. Henrikson could show "*directly* … that a discriminatory reason more likely motivated the employer or *indirectly* … that the employer's proffered explanation is unworthy of credence." *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 71 (1st Cir. 1984), quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981). Because the Court agrees with the interpretation given the CBA by the Town and Union, and because that interpretation is a question of law and not fact, the Court could hardly find that this proffered explanation is "unworthy of credence."

That leaves Ms. Henrikson dependent upon showing that the Town and Union sought to hide behind the CBA to shield their "true" motivation of sex discrimination. While evidence that similarly situated males were treated differently would clearly assist Ms. Henrikson in raising a genuine question of pretext, "a weak issue of fact" will not suffice. *Ugurhan Alcturk Kosereis v. Rhode Island, supra* at 215, citing *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 148 (2000). Nor may she rest "merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Smith v. Stratus Computer, supra* at 16, quoting *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir. 1993). Instead, she must show that she was

---

[22] Ms. Henrikson took the State Agility Test in October 2009 but did not pass it. (ECF No. 58-1 ¶34). Moreover, it appears that the person hired for the position was not one "with similar qualifications," because he had taken and passed all five requirements of the posting. (ECF No. 58-4). Ms. Henrikson has submitted no evidence disputing that applicant's completion of all five tests. Subsequent hires were similarly qualified. (ECF No. 58-15).

22

"similarly situated *in all relevant aspects*" to males who were treated differently. *Id.* at 17 (emphasis original).

Here, to stave off summary judgment, Ms. Henrikson contends that the Town has in the past allowed transfers of male employees to firefighting positions, and perhaps even hired new employees, without meeting the testing criteria. She names four or five males.[23] Although Ms. Henrikson's deposition testimony asserts their failure to complete the test, the documents submitted by the Defendants reviewed by the Court contradict Ms. Henrikson's contention; her deposition testimony, which does not claim personal knowledge and is unsubstantiated by any proffered evidence, does not raise a genuine issue of material fact sufficient to raise an inference of discriminatory treatment. At most, it appears that one male dispatcher for the East Greenwich Fire District in the mid-1980's was permitted to transfer into a firefighter position without taking the agility test. Former Fire Chief Peter Henrikson testified at deposition, however, that no agility test was required at the time, and moreover, that person had been a voluntary firefighter already. (ECF 63-5(K) at 30). The Court agrees with the Town and Union that he was not similarly situated to Ms. Henrikson. In any event, even if he had been excused from a required agility test, that single example, removed by more than two decades from Ms. Henrikson's requested transfer, is not sufficient to carry this case to trial. With respect to the others named by Ms. Henrikson, the documentary evidence submitted indicates that each passed the tests before being placed on the eligibility list. One had not taken some of the tests for East Greenwich, but had taken them for another Fire District and he testified at deposition that the tests were given jointly. Former Chief Henrikson also testified that all the men who transferred from administrative positions to firefighter positions had served previously as firefighters; Ms.

---

[23] Documents pertaining to those persons were submitted under seal, in accordance with a protective order agreed to by the parties. (ECF Nos. 67, 73).

Henrikson was the first administrative employee asking to transfer who had not previously served either as a firefighter or a volunteer firefighter (*Id.* at 29-30). Ms. Henrikson further relied on the failure of one hiree's personnel file to contain evidence of an agility test, but the Defendants submitted documents indicating that person was not placed on the eligibility list until he had successfully completed all five tests.

Ms. Henrikson has failed to show any direct evidence of animus based on gender. Nor has she created by circumstantial evidence a reasonable inference that she, as a woman, has been treated differently from men in a way that caused her not to be hired as a firefighter. Her claim of disparate treatment cannot survive a Rule 56 motion.

(2) Disparate Impact

It is well-settled that discrimination in employment can be proven by the adverse discriminatory impact of a facially-neutral policy upon a protected class of persons. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431 (1971) ("The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.").

Disparate impact claims are often proven through presentation of statistical evidence demonstrating that the *effect* of the application of what may be a facially neutral policy is to disadvantage a particular protected group in disproportionate numbers to those outside the group. In this case, the question is whether Ms. Henrikson is armed with the requisite statistical showing that subjecting applicants for transfer to firefighter positions to the same five tests as new hires has a disproportionately adverse impact on women compared to how it impacts men.[24] The disparate impact demonstration actually consists of three separate showings:

---

[24] For example, a prima facie case of racial disparate impact discrimination was made out in a challenge to a policy requiring sponsorship of an existing member in order to obtain union membership. *EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594 (1st Cir. 1995).

> In the disparate impact milieu, the prima facie case consists of three elements: identification, impact, and causation. First, the plaintiff must identify the challenged employment practice or policy, and pinpoint the defendant's use of it. ... Second, the plaintiff must demonstrate a disparate impact on a group characteristic, such as race, that falls within the protective ambit of Title VII. ... Third, the plaintiff must demonstrate a causal relationship between the identified practice and the disparate impact.

*EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 601 (1st Cir. 1995) (citations omitted).

In this case, Ms. Henrikson appears to challenge the Physical Performance Assessment Test in support of her claim in Count II that the Defendants "adopt[ed] a selection criterion which regardless of intent, has the effect of foreclosing eligibility to all female applicants ...". Ms. Henrikson relies on data from the Rhode Island State Association of Fire Chiefs, (ECF 63-5(N), to challenge specifically (and uniquely out of the five tests) the Physical Performance Assessment Tests. She contends that a "cursory review" of the data supports disparate impact because Ms. Henrikson and 290 others participated in the October 2009 test; that of the 14 women who took the test none passed while the 277 males had an 85.5% pass rate. In April 2010, 17% of the 12 women taking the test passed, and 87% of the males passed.[25] *Id.* The eligibility list as it existed on June 26, 2010, has 28 names that appear to be all male. (ECF No. 58-15).

The problem Ms. Henrikson faces is that a "cursory review" is not sufficient to withstand summary judgment of this kind of claim: (a) she has not provided a foundation demonstrating the admissibility of this "evidence;" and (b) she proffers no evidence to establish the causal link between data and the discriminatory impact. The numbers, while certainly raising an eyebrow of

---

[25] It appears that the women taking these tests were doing so in connection with applications for employment elsewhere, as former Chief Peter Henrikson testified in deposition that he knew of no women other than Ms. Henrikson (his wife) who had applied for a firefighter position in East Greenwich. ECF No. 63-5(K) at 26.

suspicion of disparate impact, cannot stand alone or "speak for themselves." They generally

need *some* sort of qualified person to speak for them,[26] and Ms. Henrikson has proffered none.[27]

Ms. Henrikson is required to raise at least a credible issue of fact that the application of

the five-test criteria to transferees has a disparate impact on women. She has focused her attack

on the physical agility test and proffered only that a disproportionately small number of women

have passed it. These kinds of cases, however, are predicated upon expert testimony

demonstrating a causal connection between the *particulars* of the agility testing and the

characteristics of women as a group such that requiring the test makes it less likely that women

would become qualified applicants.[28]

*Fudge v. City of Providence Fire Department*, 766 F.2d 650 (1st Cir. 1985), is

particularly instructive. There, the plaintiff claimed discrimination by disparate and adverse

---

[26] The lack of an expert statistical analysis is not always fatal, particularly when the challenge is that "a screening test for admission to employment imposes a disparate and adverse impact" on a protected group. *EEOC v. Steamship Clerks Union, supra*, at 604. In *Steamship Clerks Union*, however, the membership criterion itself raised an obvious inference of racial discrimination: union members had to be sponsored by current members. The data showed that every new member was related to a current member, the then-current membership was entirely Caucasian, and no African-American or Hispanic persons were among 30 recruits to be granted union membership even though between 8% and 27% of the applicant pool was African-American or Hispanic. *Id.* Causation could be inferred in that case "in part because the [membership policy] would itself naturally have discouraged potential minority candidates." *Id.* at 606.

[27] In a similar failure, Ms. Henrikson's Memorandum (ECF No. 63-1 at 39 n.4) notes that she has data for tests administered from October 2010 to October 2013, "however the data provided has not been synthesized in a manner which analyzes the passage rates of women and men." The Court fails to understand what this sentence means. If it means that no one has done the calculations of passage rates by gender, it does not help Ms. Henrikson to say, essentially, "the data exists but has not been analyzed."

[28] On April 23, 2014, the Court entered a Text Order staying until further order expert discovery. While that Order relieved the parties from the *obligation* of identifying an expert at that time, it did not *preclude* the parties from doing so. To the extent that expert testimony is integral to Ms. Henrikson's presentation of a *prima facie* case, it was incumbent upon her to either provide supporting expertise in opposition to summary judgment or request more time in which to do so, pursuant to Fed.R.Civ.P. 56(d)(2).

impact on blacks of the written test used by the city in screening applicants for employment. The plaintiff's expert based his opinion "wholly on the number and racial composition of the group of applicants who took the 1974 examination and who passed it, namely a total of 248 applicants: 224 whites taking the exam and 30 of them being accepted; and 24 blacks taking the exam and 1 of them being accepted." *Id.* at 656. The plaintiff relied *solely* on the outcome figures and "could not say there was any bias in the test per se." *Id.*

> There is no evidence from the witness Lopez or from any source bearing on whether either the form or the content of particular questions or sets of questions in the 1974 examination, or in the 1972, 1973, or 1978 examinations, might be more or less difficult for blacks generally as compared with whites generally. There is no evidence that pen and pencil examinations of this sort are more or less difficult for blacks than for whites. There is no evidence that the heavy emphasis (50 points in 1974) on the written examination as contrasted with the scholastic attainment and the military service (10 points) was more or less favorable to blacks as compared with whites."

*Id.* at 656. In the absence of any expert evidence - "on whether either the form or the content of particular questions or sets of questions .... might be more or less difficult for blacks generally," or that "pen and pencil examinations of this sort are more or less difficult for blacks than for whites, ..." or "that the heavy emphasis (50 points in 1974) on the written examination .... was more or less favorable to blacks as compared with whites ..." – the plaintiff failed to make a prima facie case. *Id.* at 656-57.

Just as the disparity between men passing the agility test and women failing it creates a suspicion of disparate impact in this case, the outcome of testing in *Fudge* justified an "intuitive judicial judgment" of a substantial discrepancy. But "such an intuitive response to substantiality is an insufficient basis for a finding of disparate impact. Where the use of employment tests results in differential pass rates for blacks and whites, even an apparently substantial differential,

the discrepancy may be due to chance." *Id.*[29] *Compare, Legault v. aRusso,* 842 F.Supp. 1479, 1487 (D.N.H. 1994) (disparity – that 30 of 35 male candidates passed agility test while none of 11 female candidates did - corroborated by expert testimony analyzing the components of the agility test given to firefighter applicants for its particular impact on women).

Ms. Henrikson's submission in opposition to summary judgment is devoid of any information at all about the agility test: what does it consist of? What are applicants required to do? What is it about the test, if anything, that makes it more difficult for women to pass it?[30]

"[T]he plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged." *Watson v. Fort Worth Bank &*

---

[29] Where the sample is large enough, a disparity alone can raise an inference of discrimination by use of what is commonly referred to as the "four-fifths" rule established in the EEOC's Uniform Guidelines on Employee Selection Procedures. *Easley v. Anheuser-Busch, Inc.,* 758 F.2d 251, 256 n.8 (8th Cir. 1985). There, the sample was of 1,500 test-takers (679 black and 798 white). The First Circuit, however, has very recently noted criticism of the four-fifths rule, not only in cases like *Fudge* where it termed the sample size "small," but also as a method to "parry a proper statistical proof of a nonrandom distribution in a case with a large sample size." *Jones v. City of Boston,* 752 F.3d 38, 51-52 (1st Cir. 2014) (challenge to city's drug testing program for police officers as having a disparate impact on the basis of race).

[30] The Court notes that Ms. Henrikson has not challenged any of the other tests (swim, ladder, written and oral), and did not attempt to take any of them. (ECF 58-1, ¶37). She does not contend that she was not permitted to take them because she failed the physical agility test. *Compare, Legault v. aRusso,* 842 F.Supp. 1479, 1483 (D.N.H. 1994) (applicant eliminated from process after failing hose-pulling test). It would seem true as a matter of logic that even assuming *arguendo* that the physical agility test is gender-discriminatory, it would not be the barrier to employment unless Ms. Henrikson either (a) passed the other tests; or (b) challenged them as well. Even if the Court were to allow the disparate impact claim to go to the jury, and were Ms. Henrikson to persuade a jury that the agility test discriminates against women, how could she be entitled to relief in light of the Court's finding that the contract requires four additional tests and she has neither taken nor challenged them? It is also significant that former Chief Peter Henrikson testified at deposition that he believed the failure to hire women was due to their inability to pass the *written* test; he also testified, somewhat contradictorily, that he believed no women had previously applied to East Greenwich for a firefighter position. (ECF 63-5(K) at 26).

28

*Trust*, 487 U.S. 977, 994 (1988). Essentially, this is part of the burden to show that the *cause* of the disparity is discriminatory. *See e.g., EEOC v. Kaplan Higher Learning Edu.,* 2013 WL 322116 at 4 (N.D.Ohio 2013), *aff'd,* 748 F.3d 749 (6th Cir. 2014) (once plaintiff's expert testimony was excluded because of unreliability, there was no evidence that use of credit checks as employment criterion caused the racial disparity in hiring and summary judgment for defendants was appropriate); *El v. SEPTA,* 418 F.Supp.2d 659, 668-69 (E.D.Pa. 2005), *aff'd* 479 F.2d 232 (2007) (expert testimony on the connection between employment policy on criminal history and racial disparity in hiring).

In the absence of a proffer of expert testimony to make the leap from the bare statistics on the number of women passing the agility test and the characteristics or attributes of women as a group that put them at a disadvantage (or, put another way, the particulars of the test that cause women to be disadvantaged), Ms. Henrikson has not placed a material fact in genuine dispute. *Compare, Peng-Fei Chang v. University of Rhode Island,* 554 F.Supp. 1203, 1205 (D.R.I. 1983) (competing affidavits from experts who would be allowed to testify at trial, interpreting promotional data of faculty promotions and salaries created a genuine issue of material fact). *Accord, Pietras v. Board of Fire Comm'rs,* 180 F.3d 468, 475 (2nd Cir. 1999) (expert testimony necessary when sample size small).

### (3) §1983 Deprivation of Civil Rights

Finally, Count III claims sex discrimination as a deprivation of civil rights under color of state law pursuant to 42 U.S.C. §1983.[31] This contention affords Ms. Henrikson no greater relief

---

[31] A private actor, as the Union is here, may be said to have acted "under color of state law" if it engaged in a joint action with a state actor. *Alberto San, Inc. v. Consejo De titulares Del Condominio San Alberto,* 522 F.3d 1, 8 (1st Cir. 2008) (finding that condominium association was not a state actor). "Joint action" means "participa[ting] in joint activity with the State or its agents." *Id.,* quoting *Lugar v. Edmonson Oil Co.,* 4567 U.S. 922, 941 (1982). The Town and the

than she gains through Count I, which claimed sex discrimination under Title VII. Section 1983 adds nothing to the equation.

In order to prevail as a §1983 plaintiff claiming a denial of equal protection, she must "show that the defendant acted with discriminatory intent." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896 (1988). She must bring forth the same proof to raise a jury question as to whether the Town intentionally discriminated against her on the basis of gender when it denied her the ability to transfer into a firefighter position without completing the five extrinsic test requirements. "Because a showing of discriminatory intent is also necessary to make out a claim of disparate treatment under Title VII, 'we have recognized that the analytical framework for proving discriminatory treatment [under title VII] ... is equally applicable to constitutional and title VII claims.'" *Id.,* partially quoting *White v. Vathally,* 732 F.2d 1037, 1039 (1st Cir.), *cert. den.,* 469 U.S. 933 (1984).

The Court has already found that no genuine issue of fact exists that would permit, in the context of a Title VII claim, an inference of discriminatory intent on the record before it. For the reasons stated above, the Court finds the Town entitled to summary judgment on Count III.

### F. Count IV:  Rhode Island Civil Rights Act of 1990, §42-112-1

The Rhode Island Civil Rights Act (RICRA) was enacted in 1990 in order to provide "broad protection against all forms of discrimination in all phases of employment." *Horn v. Southern Union Co.,* 927 A.2d 292, 293 (R.I. 2007), quoting *Ward v. City of Pawtucket Police*

---

Union were, in this Court's opinion, engaged in a joint action entering into the collective bargaining contract; thus, if that contract discriminated against female applicants, a §1983 "color of state law" claim could be made out against both. *But see, Williams v. New York City Hous. Auth. & Local 237,* 2007 WL 4215876 at 5 (S.D.N.Y. 2007), *aff'd, Williams v. New York City Hous. Auth.,* 335 Fed.Appx. 108 (2nd Cir. 2009) (union did not act under color of state law unless it "conspired" with the public agency to "act in concert to inflict unconstitutional injury").

*Department*, 639 A.2d 1379, 1381 (R.I. 1994). The Defendants claim Ms. Henrikson's RICRA claim is out-of-time.

The operative events in this case were the failure of the Union to pursue her grievance in July 2009, and the refusal of the Town to afford her the firefighter position in November 2009. Her lawsuit was filed on August 23, 2011; the Union was named as a defendant allegedly violating the RICRA in an Amended Complaint filed on February 23, 2012 (ECF Nos. 1, 20). In *Horn,* on a certified question from this court, the Rhode Island Supreme Court determined that the applicable statute of limitations for claims brought pursuant to the RICRA is one-year, "engrafting onto the RICRA the one-year statute of limitations contained in the [Rhode Island Fair Employment Practices Act]." *Horn* at 295.

Ms. Henrikson counters that, in apparent response to *Horn*, the Rhode Island General Assembly extended the statute of limitations to three years. R.I.G.L. §42-112-2. She argues at length that the extended period applies to her, as the change to three years took effect while the initial one-year period was still running. (ECF 63-1 at 40-44). This is a question of state law that the Rhode Island Supreme Court has apparently not addressed directly.[32]

It is clear, however, that on the merits of the RICRA claim, the state law analysis employs the federal Title VII framework. *Casey v. Town of Portsmouth*, 861 A.2d 1032, 1036 (R.I. 2004) ("to provide understanding to [the RICRA and the R.I. Fair Employment Practices Act], we look to the federal interpretations of Title VII of the Civil Rights Act of 1964"). Indeed, Ms. Henrikson in her memorandum opposing the Defendants' Motions for Summary Judgment on this issue explicitly "relies upon her discussion above regarding her disparate

---

[32] *See Huntley v. State*, 63 A.3d 526, 533 (R.I. 2013) (court did not reach statute of limitations issue because of decision on *res judicata*).

treatment claim under Title VII in support of her position that summary judgment is also inappropriate at this time with regard to her RICRA claim." (ECF No. 63-1 at 45).

The Court need not resolve the limitations issue. Its decision granting summary judgment to the Defendants on Count I, as well as the other discrimination claims of Counts II and III, is equally applicable to the RICRA claim. *See supra* at Part III(E).

The Court grants summary judgment as to Count IV to the Defendants.

## IV.

## Conclusion

Not unlike some other professions, firefighting has historically been a man's world, and the efforts by both firefighters themselves and the municipalities they work for to keep women out of the front lines have often been extreme. *See e.g., O'Rourke v. City of Providence*, 235 F.3d 713 (1st Cir. 2001) (detailing a series of harassment that created a hostile work environment for Providence's first female firefighter).[33]

Impediments to career moves are discouraging and frustrating, and even more so when they are perceived as motivated by discrimination. This case however stands out for its lack of evidence of express or implied expressions of *animus* between the parties and, indeed, Ms. Henrikson has acknowledged that she believes the Union took the position it did because of a

---

[33] While the reaction of some fire departments to gender integration may be welcoming, cases of hostile work environment claims related to fire departments are not uncommon, *e.g., Fisher v Town of Orange*, 964 F.Supp.2d 103 (D.Mass. 2013) (Orange Fire Department); *Morrison v. Greeson*, 2007 WL 2237624 at 14 (S.D.Ind. 2007) (Indianapolis Fire Department); *Silverman v. Johnson*, 2004 WL 2044182 at 13 (N.D.Ill. 2004) (Northlake Fire Protection District); *Council v. City of Topeka, Kansas*, 1990 WL 11061 at 1 (D.Kan. 1990) (Topeka Fire Department); *Tetzlaff v. City of Woodland*, 2000 WL 1459726 (9th Cir.) (Woodland Fire Department). *See also, Pontarelli v. Stone*, 930 F.2d 104 (1st Cir. 1991) (suit alleging sex discrimination involving Rhode Island State Police), and *White v. New Hampshire Dep't of Corrections*, 221 F.3d 254, 260-61 (1st Cir. 2000) (evidence of sexual remarks, innuendo, ridicule, and intimation).

sincere belief in the correctness of its interpretation of the CBA language.[34] There is absolutely no suggestion in any of the exhibits relied upon by Ms. Henrikson of any overt or even implied anti-female statements, or behavior, or reasonable inference to be drawn on the part of anyone speaking for the Town or the Union.

While that may make Ms. Henrikson's workplace on its surface seemingly more welcome to women, it has the opposite effect on how welcome the courthouse can be to her lawsuit. On this record, there is simply a paucity of evidence to suggest that the Town's and Union's reliance on the contractual language of the CBA was a mere pretext for a more insidious attitude, or a sham rationale to hide unlawful discrimination. The interpretation of the CBA to allow the Town to impose the qualifications that Ms. Henrikson acknowledges she does not meet is not only a substantial and reasonable explanation for the failure to transfer her, it is a correct interpretation that accords with this Court's own interpretation of the CBA.

There is no genuine dispute of any fact that is material – i.e., that could, if Ms. Henrikson's version were believed, support a verdict for her on any theory of liability alleged. Summary judgment on all counts is therefore an appropriate resolution. The Court GRANTS the Town's Motion for Summary Judgment (ECF No. 56), GRANTS the Union's Motion for Summary Judgment (ECF No. 57), and DENIES Ms. Henrikson's Cross Motion for Summary Judgment (ECF No. 63). Judgment shall enter for all of the Defendants, no costs.

---

[34] Indeed, initially Fire Chief McKenna appeared to be an advocate of Ms. Henrikson's transfer – he had previously expressed the opinion that she met the minimum qualifications. Ms. Henrikson does take the position, though, that the offers she received from William Purcell and Mark Collins of the Local to assist her in completing the agility, ladder, swim and written tests were not "genuine or sincere." *See* (ECF No. 49 at ¶44).

SO ORDERED:

John J. McConnell, Jr.
United States District Judge

March 23, 2015